

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*Barbara J. Houser*

**United States Bankruptcy Judge**

**Signed July 03, 2012**

---

THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 11-31919-13 |
| PATRICIA PEREZ, | § | (Chapter 13) |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| JULIO AVILA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 11-03384 |
| | § | |
| PATRICIA PEREZ, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

The Court tried this adversary proceeding (the "Adversary") on May 10, 2012. Plaintiff, Julio Avila ("Avila"), is an individual who was residing in San Bernardino, California at all relevant times and who engaged in a series of real estate transactions with the defendant, Patricia Perez ("Perez"). Perez is an individual residing in Fort Worth, Texas, who filed for relief under chapter 13 of the Bankruptcy Code on March 23, 2011. In the Adversary, Avila seeks to (i) liquidate his claims against Perez, and (ii) have his claims determined to be nondischargeable in Perez's bankruptcy case.

Several issues arose during closing arguments which had not been briefed by the parties. Thus, post-trial briefs were required, the last of which was submitted on May 29, 2012, after which the Court took the Adversary under advisement. The Court may enter both a final judgment and a monetary judgment in the Adversary. *Morrison v. W. Builders of Amarillo (In re Morrison)*, 555 F.3d 473, 479–80 (5th Cir. 2009). This Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Beginning of a Business Relationship

Although Avila resided in San Bernardino, California, where he had a job and owned a home, he began to consider moving due to the high cost of living in California. In early 2006, Avila spoke to a friend about moving to Texas. Avila was attracted to the idea of moving to Texas because the cost of living was better in Texas than in California, in particular real estate was significantly cheaper, and Texas was much closer to Mexico, and therefore, to Avila's

family.[1]   This same friend introduced Avila to Perez and recommended that Avila use Perez as his real estate agent when looking for a home in Texas.[2]   Indeed, Avila testified that he would not have spoken to Perez had she not been a real estate agent.[3]   After speaking over the phone with Perez on several occasions, Avila visited Texas in March 2006.[4]   During this two–day visit to Texas, Avila and Perez toured five houses.[5]   Avila did not purchase a house on the March trip because he found the houses he looked at to be too expensive and not to his taste.[6]   However, Avila remained interested enough in moving to Texas that he refinanced his California home in April 2006 in order to obtain funds for a possible future purchase of a Texas home.[7]   After Avila returned to California, he and Perez continued to communicate about potential properties.[8]   While it is undisputed that Avila never executed any written agreement with Perez, both parties agree that Perez acted as Avila's real estate agent with respect to his purchase of properties in Texas.[9]

---

[1]   Audio Recording: Trial of *Avila v. Perez*, held in the Bankruptcy Court, Northern District of Texas (hereinafter "Trial Record"); Testimony of Avila, May 10, 2012 at 9:29–30 a.m. (On file with the Bankruptcy Court).  The Court will note at the outset that the record is not as crisp as the Court would prefer.  Avila testified with the aid of a translator and neither Avlia, nor Perez, the only two witnesses, were entirely clear as to the chronology or details of events.

[2]   *Id.*

[3]   *Id.*

[4]   *Id.* at 9:31–34 a.m.  The exact dates are unclear from the testimony but are ultimately immaterial to the Court's findings and conclusions.

[5]   *Id.* at 9:43 a.m.

[6]   *Id.* at 9:43–44 a.m.

[7]   *Id.*

[8]   *Id.*

[9]   Trial Record: Testimony of Perez, May 10, 2012 at 1:57 p.m.

As will be discussed in further detail below, Avila eventually entered into a series of seven transactions with Perez acting as his real estate agent.[10]   For each of these transactions Perez would locate a property for sale and then contact Avila with the relevant information, including price, at which point Avila would send Perez money if he was interested in purchasing the property.[11]   Perez would then act as a property manager for Avila, albeit on an informal, non-written, contractual basis.  If a property was occupied at the time of purchase, Perez would collect rents and deposit them in Avila's bank account less a ten percent (10%) fee for her services.[12]   If any repairs needed to be done to a property, Perez would inform Avila.[13]   Upon learning the projected cost of the repairs from Perez, Avila was to deposit the necessary funds into Perez's Bank of America account and Perez was to make arrangements for the repairs to be completed.[14]   If the property was a house to be "flipped," Perez was supposed to oversee all necessary repairs and construction.[15]   In fact, Perez represented to Avila that she had experience serving as a contractor.[16]

---

[10]   The parties filed stipulations with the Court as to six of the transactions.  To the extent that the trial testimony regarding these transactions differed from the stipulations, the Court will defer to the stipulations.  The only transaction not stipulated to was the purchase of the unidentified lot.  The stipulations are located at Docket # 39 and will be referred to hereinafter as the "Stipulations."

[11]   Trial Record: Testimony of Avila, May 10, 2012 at 9:39 a.m.; Testimony of Perez, May 10, 2012 at 1:59 p.m.

[12]   Trial Record: Testimony of Avila, May 10, 2012 at 9:39 a.m.; Testimony of Perez, May 10, 2012 at 1:59 p.m.

[13]   Trial Record: Testimony of Avila, May 10, 2012 at 9:39 a.m.; Testimony of Perez, May 10, 2012 at 1:59 p.m.

[14]   Trial Record: Testimony of Avila, May 10, 2012 at 9:46–47 a.m.

[15]   *Id.* at 10:17 a.m.

[16]   *Id.*

### B. 3413-3415 Greenridge, Fort Worth, Texas ("Greenridge").

In August 2006 Perez contacted Avila about a duplex that was for sale — *i.e.*, Greenridge.[17] After concluding that Greenridge would be a good investment, Avila sent Perez $109,000, which sum Avila had obtained from refinancing his home.[18] However, despite purchasing Greenridge, Avila did not move to Texas because the duplex was already tenant-occupied.[19] As noted previously, Perez and Avila decided that Perez would serve as property manager for Avila and would collect the rent.[20] Avila testified that he agreed to this arrangement because Perez represented to him that she was a licensed property manager.[21] Perez drafted the lease agreements and was responsible for finding tenants. While Perez actually collected the rents and deposited Avila's share into Avila's bank account for a period of time, Perez never provided Avila with an accounting for the rents collected on Greenridge.[22]

When repairs needed to be made to Greenridge Perez contacted Avila.[23] On June 7, 2007, Perez sent Avila an invoice for needed repairs to Greenridge totaling $1,675.[24] Plaintiff's

---

[17] *Id.* at 9:36 a.m.

[18] *Id.* at 9:38 a.m.; Stipulation 1 (Docket #39).

[19] Trial Record: Testimony of Avila, May 10, 2012 at 9:39–41 a.m.

[20] *Id.*

[21] *Id.* The Court notes that Perez denied that she told Avila that she was a licensed property manager, and in fact admitted on cross-examination that it would have been a violation of her realtor employment contract to serve as both a real estate agent and property manager simultaneously. However, for reasons that will be explained below (*see infra* at pp. 14–15), the Court finds Avila to be the more credible witness and further finds that Avila would not have allowed Perez to serve as his property manager if he had not believed that Perez was a licensed property manager.

[22] *Id.*

[23] *Id.* at 9:39–41 a.m.

[24] Trial Record: Testimony of Perez, May 10, 2010 at 2:49–51 p.m. While Perez's cross-examination revealed that most of the invoices proffered as evidence were in fact fabricated, allegedly on the advice of counsel, Perez testified on cross-examination that this particular invoice was actually sent to Avila at the time it was dated and that Avila paid the invoice.

Exhibit 11. Upon receipt of the invoice Avila paid Perez $1,675 so that the work could be done; however, there is no evidence apart from Perez's testimony that any repairs were actually completed.[25] Avila subsequently transferred $1,250 to Perez in September 2007 for additional repairs on Greenridge at Perez's request.[26] When Avila returned to Texas in the fall of 2008 he observed that no repairs had ever been done on Greenridge.[27]

### C. 2902 Galemeadow, Fort Worth, Texas ("Galemeadow").

On October 26, 2006 Avila purchased Galemeadow, paying approximately $58,000.[28] As with Greenridge, Perez ostensibly drafted lease agreements and located tenants for Galemeadow. Perez would collect rents and deposit Avila's share into his bank account — at least for a period of time, but Perez never provided Avila with any accounting for the rents collected on Galemeadow.[29]

In November 2006 Avila received two invoices in the amounts of $5,840 and $1,200 respectively, for repairs to Galemeadow, including painting the interior and exterior of the house.[30] Plaintiff's Exhibit 29. Avila wired Perez the funds as requested.[31] Although Perez testified that the repairs were completed, there are no receipts or any other evidence to

---

[25] *Id.* at 2:59–3:01 p.m.

[26] Trial Record: Testimony of Avila, May 10, 2012 at 9:48–49 a.m.

[27] *Id.* at 9:51 a.m. The record is unclear as to whether Avila returned in October or November. In any case, it was fall when he finally returned to Texas.

[28] *Id.* at 9:52–53 a.m.

[29] *Id.* at 9:53–54 a.m.

[30] *Id.* at 9:56–57 a.m.

[31] *Id.*

corroborate her testimony.[32]   From a letter signed by Wilfrano Hernandez, the tenant at Galemeadow, it is clear that numerous required repairs were not completed under Perez's management.[33]  Plaintiff's Exhibit 33.

**D.  8521 Delta Way, Fort Worth, Texas ("Delta Way").**

On May 24, 2007, Avila purchased Delta Way.[34]   When Perez contacted Avila about Delta Way, Perez informed Avila that she originally intended to purchase the house on her own and had already put down $3,000 in earnest money.[35]   Perez told Avila that it would be preferable for Avila to purchase the property in his name instead, although Perez did not explain why.[36]   Avila agreed to buy Delta Way and to reimburse Perez for her earnest money deposit. Avila deposited $3,000 into Perez's Bank of America account and subsequently deposited an additional $12,900 as a down-payment for the property.[37]   Delta Way was also rented to tenants and the parties conformed to their usual practice with regard to rents and repairs.[38]

Perez sent Avila an invoice for repairs in the amount of $3,114.[39]  Plaintiff's Exhibit 24. Shortly after receiving this invoice Avila deposited $3,114 into Perez's bank account for the repairs.  Plaintiff's Exhibit 26.  However, much like the repairs that were to be done on the other

---

[32] *Id.*; Trial Record: Testimony of Perez, May 10, 2012 at 2:00–01 p.m.

[33] Trial Record: Testimony of Avila, May 10, 2012 at 9:58–59 a.m.

[34] *Id.* at 10:02 a.m.; Stipulation #1 (Docket #39).

[35] Trial Record: Testimony of Avila, May 10, 2012 at 10:03 a.m.

[36] *Id.*

[37] *Id.* at 10:04 a.m.

[38] *Id.* at 10:06 a.m.

[39] *Id.* at 10:08 a.m.

properties, there are no receipts or corroborating documents establishing that any of the work was undertaken or completed.[40]

### E. The Unidentified Lot

In the summer of 2007 Perez contacted Avila and proposed that Avila pay her $10,000 for a lot that Perez owned.[41] Perez further proposed that they would construct a home on the lot and then sell both the home and the lot for a profit, with the profit split 50/50.[42] Perez assured Avila that she would put both of their names on the deed to the lot.[43] On August 2, 2007 Avila caused a cashier's check to be issued in the amount of $10,000 payable to Perez for the purchase of this lot. Plaintiff's Exhibit 94. Avila later received and responded to an invoice from Perez for $1,000 for a bathtub and roofing materials for the house that was to be built on the lot, and sent that amount to Perez.[44] Plaintiff's Exhibit 65.

No house was ever built on this lot, nor was Avila ever given a copy of the deed or even the address of the lot.[45] Additionally, despite Perez's assertion that the bathtub and roofing materials were purchased but then stolen or abandoned, no receipt exists to prove that they were ever purchased.[46]

---

[40] Trial Record: Testimony of Perez, May 10, 2012 at 2:59–3:01 p.m.

[41] Trial Record: Testimony of Avila, May 10, 2012 at 10:10 a.m. Perez contends that the $10,000 was a gift from Avila. However, Avila submitted a copy of the cashier's check which specifically states "deposit for a lot." Combined with the fact that Perez was a less than credible witness, the Court finds that the $10,000 was indeed for the purchase of a lot and was not intended to be a gift.

[42] *Id.* at 10:10 a.m.

[43] *Id.*

[44] *Id.* at 10:13–14 a.m.

[45] *Id.* at 10:13 a.m.

[46] Trial Record: Testimony of Perez, May 10, 2012 at 2:11–14 p.m.; Testimony of Avila, May 10, 2010 at 10:13–15 a.m.

### F.  804 E. Ramsey, Fort Worth, Texas ("Ramsey").

In October 2007, Perez approached Avila about purchasing Ramsey.[47]  Perez informed Avila that the house needed substantial repairs and that she had already made a $15,000 down payment.[48]  Perez told Avila that if he paid an additional $20,000 towards the purchase of the house she would help him repair it, as she had contracting experience and contacts in the local construction industry.[49]  Perez told Avila that after the home was repaired and sold, Perez would recoup her initial investment and any remaining proceeds would be split between Perez and Avila 50/50.[50]

Avila sent Perez the $20,000, which he obtained from taking out a home equity line of credit on his home in California.  And, on December 10, 2007 Avila deposited an additional $10,000 into Perez's Bank of America account for repairs on Ramsey after receiving an invoice from Perez for repairs she had allegedly made.[51]  Plaintiff's Exhibit 53.  When Avila returned to Texas in October or November of 2008 he discovered that less than half of the repairs that Perez had said she had made had been completed and that no tenants were ever located for Ramsey. Avila testified that he believed that only approximately $3,500 of the $10,000 was actually used for repairs.[52]  Plaintiff's Exhibit 68.

---

[47]  Stipulation #1 (Docket #39).

[48]  Trial Record: Testimony of Avila, May 10, 2012 at 10:16–17 a.m.

[49]  *Id.* at 10:16–21 a.m.

[50]  *Id.*

[51]  *Id.* at 10:24–28 a.m.

[52]  *Id.* at 10:28–29 a.m.

### G.   3516 May Street, Fort Worth, Texas ("May Street").

After the purchase of Ramsey, Perez contacted Avila about May Street.[53]   Avila purchased May Street on January 24, 2008.[54]   Prior to purchasing May Street, Perez informed Avila that like Ramsey, May Street was in need of significant repairs.[55]   Perez also asked Avila to put both of their names on the deed.[56]   Perez informed Avila that she had already put $15,000 towards the purchase of May Street, outside of any contract, and had convinced the owner to sell the house for only $40,000.[57]   Perez told Avila that he only needed to pay $20,000 and that she would cover the remaining cost.[58]   Perez proposed that she and Avila would then refurbish the house and split any sale proceeds 50/50.[59]   Avila decided to invest in May Street and transferred the requested funds.

Avila later learned that May Street was only worth $20,647.97.[60]   Plaintiff's Exhibit 85. While Avila's $20,000 represented almost the entire value for May Street, both Avila's and Perez's names were on the deed.  Plaintiff's Exhibit 89.  Further, there is no evidence that Perez actually put $15,000 towards the purchase of May Street.[61]

---

[53]   Stipulation #1(Docket #39).

[54]   *Id.*

[55]   Trial Record: Testimony of Avila, May 10, 2012 at 10:29–30 a.m.

[56]   *Id.*

[57]   *Id.* at 10:29–31 a.m.

[58]   *Id.* at 10:30–32 a.m.

[59]   *Id.*

[60]   *Id.* at 10:29–32 a.m.

[61]   *Id.* at 10:30 a.m.  No documentation was submitted that accurately accounted for the $15,000 allegedly spent on May Street.

The repairs on May Street were never completed because Avila decided to stop funding the project.  This decision was made after Avila realized that Perez had been consistently failing to make repairs to other properties and therefore Avila would need to pay for repairs that he had already paid for once, but which had never been completed.  Because both May Street and Ramsey needed significant repairs, and Avila had lost his job, Avila was forced to choose which property to repair and he decided to focus on Ramsey.[62]

### H.    430-432 Acres, Balch Springs, Texas ("Acres").

The last property Avila purchased was Acres, which he purchased on June 13, 2008 for $85,000.[63]   Avila made a down payment of $14,964.02 and obtained a mortgage for the remainder of the purchase price.[64]   Avila did not move into Acres because it was rented to a friend of Perez.[65]   As with the other rental properties, Perez served as Avila's property manager and collected the rent.[66]

Shortly after the purchase, Avila became aware that Perez's mother was the previous owner.[67]   Being surprised by this he decided to investigate further,[68] discovering that Perez's mother received in excess of $50,000 in cash upon the closing of the sale.[69]   Avila then became

---

[62]  *Id.* at 11:17–20 a.m.

[63]  *Id.* at 10:36–38 a.m.; Stipulation #1 (Docket #39).

[64]  Plaintiff's Exhibit 72.

[65]  Trial Record: Testimony of Perez, May 10, 2012 at 3:53–54 p.m.

[66]  *Id.* at 3:57–58 p.m.

[67]  Trial Record: Testimony of Avila, May 10, 2012 at 10:39 a.m.

[68]  *Id.* at 10:38–39 a.m.

[69]  *Id.* at 10:39 a.m.  Perez corroborated this and although she was unable to remember the exact amount her mother received, her recollection was refreshed by a review of the closing statement.  Trial Record: Testimony of Perez, May 10, 2012 at 4:30–31 p.m.; Plaintiff's Exhibit 72.  Additionally, Perez testified that her mother gave her $20,000

aware that the Dallas County Central Appraisal District ("DCAD") valued Acres, both the house and the lot, at $38,020.[70]  Plaintiff's Exhibit 79.  Avila fell behind on the mortgage and Acres was sold at a foreclosure sale.[71]

### I.  Other Allegations and Relevant Information

The relationship between Avila and Perez eventually soured ultimately resulting in this Adversary.  Their relationship began to change in November 2007, when for the first time Perez failed to deposit rents that were due.[72]  Upon contacting Perez, Avila was informed that Perez failed to deposit the rents because she was in Chicago caring for her sick grandmother.[73]  Perez assured Avila that she would deposit the rents when she returned to Texas.[74]

This explanation appeased Avila enough that in January 2008 Avila loaned Perez $8,000 so that she could pay her personal income taxes.[75]  Avila believed that he was making a loan that would be repaid from Perez's share of the proceeds from the sale of one or more of their jointly-

---

of the sales proceeds to use in her restaurant venture.  Trial Record: Testimony of Perez, May 10, 2012 at 4:30–32 p.m.

[70]  On the stand, Avila testified that his primary dissatisfaction with the Acres transaction was based on his belief that he did not receive the benefit of his bargain; specifically, that he purchased a house worth far less than what he paid for it.  Avila's belief about the value of Acres appears to be based on the DCAD value and the fact that the home was sold at foreclosure for $60,000.  Trial Record: Testimony of Avila, May 10, 2012 at 10:51–52 a.m.  The Court, however, is skeptical that this is accurate evidence of the value at the time of purchase.  *See infra* at pp. 37–38.

[71]  Trial Record: Testimony of Avila, May 10, 2012 at 10:51–52 a.m.

[72]  *Id.* at 10:29–30 a.m.

[73]  *Id.* at 10:30–31 a.m.

[74]  *Id.*

[75]  *Id.* at 10:41 a.m.

owned properties.[76] The loan was never documented and Perez testified that she thought the money was a gift from Avila.[77]

In February 2008, the house on Delta Way was partially destroyed by fire.[78] Avila returned to Texas in March 2008 to see the property and speak with insurance representatives.[79] Perez offered to repair Delta Way and stated that the cost of the necessary repairs would be $15,000.[80] Avila testified that the repairs took five months to complete.[81]

Avila still maintained a certain level of trust in Perez as evidenced by the fact that in June 2008 he loaned her $5,000 for her use in a restaurant venture.[82] However, Perez's continued failures to deposit the rents caused Avila to return to Texas in October or November 2008, at which point he discovered that Perez had not made most of the repairs he had paid her to make.[83] Combined with the information he had learned about Acres, Avila decided to terminate his business relationship with Perez. [84]

---

[76] *Id.*

[77] Trial Record: Testimony of Perez, May 10, 2012 at 2:10 p.m.

[78] Trial Record: Testimony of Avila, May 10, 2012 at 10:42 a.m.

[79] *Id.* at 10:44–45 a.m.

[80] Trial Record: Testimony of Avila, May 10, 2012 at 10:45–46 a.m. It is unclear from the record whether Avila actually sent Perez the $15,000 she requested. Avila did not request repayment of the $15,000 in his January 2009 demand letter, wherein damages sought are clearly explained. Plaintiff's Exhibit 68.

[81] Trial Record: Testimony of Avila, May 10, 2012 at 10:45–46 a.m.

[82] *Id.* at 11:17–20 a.m. Similar to the income tax loan, Avila understood this to be a loan, which sum would be repaid from Perez's share of the proceeds from the sale of jointly-owned properties. In contrast, Perez testified that the $5,000 was a gift.

[83] *Id.*

[84] *Id.*

Avila then spoke with an attorney, and in January 2009 that attorney sent Perez a demand letter seeking to recover the monies Avila believed Perez owed him. Plaintiff's Exhibit 68. Perez apparently failed to respond in any meaningful way and then filed this bankruptcy case in March 2011. Avila filed the Adversary on June 20, 2011.

### J. Witness Credibility

The Court must comment on the numerous inconsistencies between the testimony of Avila on the one hand and that of Perez on the other. In many instances, Avila and Perez gave almost entirely contradictory testimony, and often the testimony of both witnesses contradicted the Stipulations. The testimony of both Avila and Perez was also frequently vague and confused, which vagueness resulted in a record far less precise than this Court would prefer. However, the Court finds that the inconsistencies of Avila and Perez are attributable to different factors.

In Avila's case, the Court finds that many of the apparent inconsistencies are attributable to the fact that Avila was testifying through a translator, as well as the effects of memory fading over time. While perhaps naïve and unsophisticated, Avila appeared to be an honest and credible witness on the stand and presented none of the usual signs of dishonesty or evasiveness. He answered questions as directly and quickly as he could, allowing for the natural delays due to the need for translations.

On the other hand, Perez was a highly incredible witness, and came dangerously close to committing perjury during the trial.[85] Perez's testimony was internally inconsistent and she was continually evasive when being cross-examined. Perez often took long pauses before answering

---

[85] In fact, at one point during closing arguments, Perez held up her hand from counsel table and asked if she could "clarify" her trial testimony. The Court requested that counsel for Perez confer with her client before allowing Perez to "clarify" her prior testimony. The Court was concerned that Perez was about to commit perjury, and upon consultation with her attorney, Perez declined to add anything further to her testimony. Trial Record: Closing Arguments, May 10, 2012 at 5:29–5:31 p.m. This is only one of several instances where the Court is seriously concerned about the veracity of Perez's testimony.

questions, frequently changed her testimony when questioned more closely, and generally appeared uncomfortable as a witness.

To the extent the testimony of Avila and Perez conflicts, the Court accepts Avila's testimony as he was a more credible witness. However, the Court recognizes that some of Avila's testimony makes little sense. For example, why Avila continued to work with Perez after discovering her lies is perplexing and, as explained below, will limit the damages recoverable for her fraud. Even recognizing that some of his testimony is hard to understand (other than to say that he was naïve and gullible), the Court remains satisfied that he was a more credible witness.

## II.     LEGAL ANALYSIS

In his First Amended Complaint to Determine Dischargeability of Debts (the "Complaint"), Avila stated that Perez was "indebted to [him] in an unliquidated sum for a debt arising from acts of actual fraud, defalcation while acting in a fiduciary capacity, embezzlement and conversion." Complaint (Docket # 12) at ¶ 4. While the Complaint is not a model of clarity, it appears Avila sought a monetary judgment against Perez for (i) actual fraud and fraudulent misrepresentation, (ii) embezzlement, and (iii) conversion, as a claim for "defalcation while acting in a fiduciary capacity" is a basis upon which a debt can be declared nondischargeable under the Bankruptcy Code, but is not a theory of liability per se. And, of course, Avila asked this Court to determine that any liquidated judgment he received at trial be declared nondischargeable under section 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code.

Shortly before trial, Avila obtained new counsel. A Joint Pretrial Order was submitted by Avila's new counsel and Perez's counsel. The Court signed that Joint Pretrial Order on April 25, 2012. The only theory of liability expressly stated in the Joint Pretrial Order is that "Perez

obtained funds from Avila under false and fraudulent pretenses," Joint Pretrial Order, Contested Issue of Law No. 1.  While there are other contested issues of law stated, none of those deal with theories of liability; rather they address contested issues of law regarding whether a judgment against Perez, once liquidated by this Court, would be nondischargeable in Perez's bankruptcy case under section 523(a)(2)(a), (a)(4), and/or (a)(6) of the Bankruptcy Code.

At trial, Avila's counsel waived opening argument, electing to proceed to the introduction of evidence in support of Avila's case-in-chief.  After the close of the evidence, Avila's counsel began to argue the case.  During that argument, and after the Court expressed concern about whether counsel had proven the requisite "fiduciary capacity" to sustain a section 523(a)(4) claim — i.e., "fraud or defalcation in a fiduciary capacity," Avila's counsel argued, for the first time, that even if Avila hadn't proven the requisite fiduciary capacity, Avila had proven embezzlement, which was another basis under section 523(a)(4) for Perez's debt to Avila to be excepted from her discharge.  The embezzlement argument took the Court by surprise because the Court had read the Joint Pretrial Order and the parties' pretrial briefs in preparing for trial and had not understood Avila to be arguing either an embezzlement theory of liability or embezzlement as a theory for excepting from Perez's discharge any debt Avila might prove was owed to him.  Of course, after the Court expressed its surprise, so did counsel for Perez, leading us to a threshold issue that must be addressed at the outset of our legal analysis, along with several alternative subsidiary issues.

Specifically, was an embezzlement claim preserved in the Joint Pretrial Order?  If not, may the Joint Pretrial Order be amended after trial to add an embezzlement claim?  If not, was embezzlement tried by consent?  Or, may relief under Federal Rule of Civil Procedure 60(b)

("Rule 60(b)") be afforded to Avila such that an embezzlement claim may be considered by the Court?

After considering these threshold embezzlement issues, the Court will turn to the theories for liability the parties agree were preserved for trial — *i.e.*, fraud and/or fraudulent misrepresentations and the theories for excepting any fraud-based judgment from Perez's discharge — *i.e.*, section 523(a)(4) "fraud or defalcation in a fiduciary capacity" and/or section 523(a)(2)(a) "false pretenses, a false representation, or actual fraud."

**A.  Is Avila Entitled to Relief on an Embezzlement Claim?**

As just noted, before reaching the merits of the embezzlement claim, the Court must first determine whether the embezzlement claim was properly preserved for trial.  At the Court's request, both sides submitted post-trial briefing on the issue of whether the embezzlement claim was still a "live" claim.  Concurrently with this post-trial briefing, Avila also filed a Rule 60(b) motion.  A hearing on the Rule 60(b) motion was held on June 18, 2012, at which time the issue was taken under advisement for consideration with the balance of the issues raised in the Adversary.  For the reasons explained more fully below, the Court does not need to reach the merits of any embezzlement claim because the Court concludes that the claim was not preserved for trial and was not tried by consent.  The Court further concludes that Avila is not entitled to relief under Rule 60(b).

**1.  Was the Embezzlement Claim Waived?**

The Court must first determine whether the embezzlement claim was waived by Avila's failure to preserve it in the Joint Pretrial Order.  It is well established in the Fifth Circuit that a joint pretrial order signed by a court supersedes the pleadings in the case and determines the

issues before the Court for trial. As noted in *Mid-Continent Casualty Co. v. Eland Energy, Inc.*, 2011 WL 2417158 at *38 (N.D. Tex. June 14, 2011) (citing *E.E.O.C. v. Serv. Temps, Inc.*, 2010 WL 5108733, at *3 (N.D. Tex. Dec. 9, 2010)), "[t]he joint pretrial order supersedes all pleadings and governs the issues and evidence to be presented at trial."[86] Or, stated another way, "[i]f a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint." *Kona Technology Corp. v. Southern Pacific Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000) (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998)). Thus, if the embezzlement claim was not included in the Joint Pretrial Order, it was waived by Avila.

Given this clear precedent, Avila first argues that the embezzlement claim was included within the Joint Pretrial Order. Perez disagrees, as does this Court. The Joint Pretrial Order contained the following relevant provisions:

> Avila and Perez had a fiduciary relationship by their business dealings and as a result of Perez acting as a real estate agent in many of the transactions described herein. Avila relied on Perez and Perez made material misrepresentations to Avila that she was handling his affairs, remitting funds to him and getting him the best prices. Such representations were false. Avila relied on such representations and was damaged by Perez. Perez intended that Avila rely on such representations.

Joint Pretrial Order "Summary of the Claims" (Docket # 33). Under "Contested Issues of Law" the parties listed the following claims:

> (1) Perez obtained funds from Avila under false and fraudulent pretenses. (2) A fiduciary relationship existed between Perez and Avila. (3) Perez committed defalcations in handling monies belonging to Avila or to be used for his benefit. (4) Perez's conduct was committed while she was an agent for Avila owing a duty of loyalty and duty to disclose. (5) The amount of the monies owed by Perez is

---

[86] *See also, Branch-Hines v. Herbert*, 939 F.2d 1311, 1319 (5th Cir. 1991) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial. . ."); *Flannery v. Carroll*, 676 F.2d 126, 129 (5th Cir. 1982) ("The claims, issues, and evidence are limited by the [pretrial] order and the course of the trial is thereby narrowed to expedite the proceeding."); *Krisher v. Xerox Corporation*, 102 F. Supp. 2d 715, 718 (N.D. Tex. 1999) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.") (Citing *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996)).

$50,454.02 for all properties except the property at 3516 May Street, and this amount is non-dischargeable pursuant to 11 USC 523(a)(4) and (a)(6). [*sic*] (6) The amount of the loan owed by Perez to Avila is $13,000 and this amount is non-dischargeable under 11 USC 523(a)(2)(A) and (a)(6). [*sic*] (7) The amount of loss incurred by Avila on the sale of 3516 May Street as a result of Perez's delays and failure to timely make repairs is at least $10,000.00. Such debt is non-dischargeable under 11 USC 523(a)(4) and (a)(6). [*sic*] (8) Any fiduciary duty Perez may have owed Avila was vitiated by Avila's knowledge of and consent to her actions.

Joint Pretrial Order (Docket # 33).    As this language shows, the word "embezzlement" is not mentioned.    Read fairly, the only section 523(a)(4) claim specifically included in the Joint Pretrial Order was a claim for "fraud or defalcation while acting in a fiduciary capacity."

Again, not surprisingly, Avila's counsel argues that the Court should apply a broad reading to the word "defalcation," consistent with dictionary definitions that include embezzlement.[87]    However, this argument ignores the fact that as used in section 523(a)(4), "defalcation" is a term of art.   Section 523(a)(4) sets forth three separate and specific bases upon which a debt can be excepted from a debtor's discharge — *i.e.*, if the debt is for (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; or (3) larceny.   Were this Court to read defalcation to include embezzlement, there would be little point in having embezzlement set out as a separate ground for recovery.

Avila's counsel also argues that the general references to section 523(a)(4) in the Joint Pretrial Order and briefs should be read to include each of the possible (a)(4) grounds.   The Court disagrees.   By specifically referencing one of the (a)(4) grounds in the Joint Pretrial Order (and briefs), the reasonable assumption is that only that (a)(4) ground was being pursued by Avila, not that any and all of the (a)(4) grounds were being pursued.

---

[87]  Specifically, Avila argues in his Post-Trial Brief that "'Defalcations' in the common sense of the word means 'to misuse funds; embezzle.'  Webster's New World Dictionary 369 (2d College Edition 1979).  Since the identified conclusion of law says, 'defalcations' it would include the concept of embezzlement."  Plaintiff's Post-Trial Brief at pp. 5–6 (Docket #32).  The Court notes that Avila has cited no case law to support this argument.

For these reasons, the Court concludes that the embezzlement claim — either as a theory of liability or as a theory for excepting any debt proven at trial from Perez's discharge — was not included in the Joint Pretrial Order and was therefore waived by Avila.[88]

### 2.   Should the Court Allow Amendment of the Joint Pretrial Order?

Avila argues in the alternative that the Court should allow him to amend the Joint Pretrial Order to include his embezzlement claim.   This relief is opposed by Perez.

Courts have "broad discretion in determining whether or not a pretrial order should be modified or amended."   *United States v. Texas*, 680 F.2d 356, 370 (5th Cir. 1982).   Federal Rule of Civil Procedure 16(e) permits a court to modify a pretrial order in order to prevent "manifest injustice."   "It has been suggested that proper treatment of the pretrial order after entry requires an appropriate balance between firmness to preserve the essential integrity of the order, and adaptability to meet changed or newly discovered conditions or to respond to the special demands of justice." *Central Distributors, Inc. v. M.E.T., Inc.*, 403 F.2d 943, 944 (5th Cir. 1968).   The Fifth Circuit has allowed amendments where "no surprise or prejudice to the opposing party results." *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 346 (5th Cir. 2002).

Here, the Court concludes that prejudice will occur if it allows Avila to amend the Joint Pretrial Order after trial.   Avila cites this Court to several cases in support of his amendment argument.   However, in each of those cases the amendment was sought before the close of evidence at trial; and therefore, the opposing party was able to offer evidence and defenses to the

---

[88]   Whether Avila waived his embezzlement claim has little practical consequence on his recovery here. The only damages Avila sought that he is not recovering are (i) two months of rents, (ii) for the Acres transaction, and (iii) for non-payment of the loans.  *See infra* at p. 42–43.  While an embezzlement claim might cause those two months of rents to be both recoverable and excepted from Perez's discharge, an embezzlement claim would not succeed with respect to Acres or the loans.  Regarding Acres, Perez did not have possession of Avila's funds.  The purchase closed through a title company.  And, with respect to the loans, Avila gave her the monies and she used them as she represented she would.  *See also infra* at p. 38.

new claims.[89] Had Avila's request to amend the Joint Pretrial Order been raised before, or even during the trial, the Court might have allowed the requested amendment. However, to allow amendment to add an embezzlement claim after the conclusion of trial would prejudice Perez because the evidence has closed and Perez will therefore be unable to defend against the claim.[90]

### 3. Was the Issue of Embezzlement Tried by Consent?

In the further alternative, Avila argues that the embezzlement issue was tried by consent. Perez disagrees, as does this Court.

Federal Rule of Civil Procedure 15(b) requires that issues tried by express or implied consent are "treated in all respects as if they had been raised in the pleadings." Whether an issue was tried by implied consent "depends upon whether the parties recognized that the issue entered the case at trial, whether the evidence supporting the issue was introduced at trial without objection, and whether a finding of trial by consent would prejudice the opposing party." *Smith v. EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004); *see also*, *Banks v. Thaler*, 593 F.3d 295, 307 (5th Cir. 2009).

---

[89] *Quick Technologies v. Sage Group PLC*, 313 F.3d 338 (5th Cir. 2002) (request to amend was made "shortly before trial"); *United States v. Texas*, 680 F.2d 356, 370 (5th Cir. 1982) (denying relief from pretrial stipulations when such relief was sought in a "belated and untimely" motion); *Central Distributors, Inc. v. M.E.T., Inc.*, 403 F.2d 943, 945–46 (5th Cir. 1968) (trial court refused to allow introduction of certain evidence on damages on the basis that said evidence was not included in the pretrial stipulation. The Fifth Circuit found that modification of the stipulations should have been allowed, even if a short continuance needed to be granted).

[90] The Court is aware that it has the power to *sua sponte* reopen the evidence. However, in the absence of a motion by either side, the Court will decline to exercise its discretion to do so. Further, the precedent set by allowing amendment to a pretrial order after the conclusion of trial would be unfortunate. Post-trial amendment defeats the very purpose of pretrial orders — *i.e.*, to narrow the scope and number of issues to be tried. Moreover, to allow a post-trial amendment encourages litigants to attempt a second bite at the apple when they become concerned about a failure of proof at trial. Finality and timeliness are important judicial concerns and there must be a point at which it is too late to amend pleadings and Pretrial Orders. Here, the conclusion of the evidence is a reasonable time by which it is too late to amend.

### a. Was Evidence Supporting the Embezzlement Claim Introduced Without Objections?

Taking the second prong first, the Court concludes that evidence supporting the embezzlement claim was introduced at trial and that this evidence was not objected to.[91] In fact, the Court would likely have found that an embezzlement claim was proven had the claim been properly preserved for trial. "Embezzlement is defined for the purposes of 523(a)(4) as the 'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) (citing *Greyhound Lines, Inc v. Thurston (In re Thurston)*, 18 B.R. 545, 550 (Bankr. M.D. Ga. 1982)). "To meet the definition of embezzlement, there must be proof of the debtor's fraudulent intent in taking the property." *Id.*

The following evidence was introduced at trial: (i) Perez requested funds from Avila for repairs, for the purchase of a bathtub and roofing materials, and for the purchase of a lot; (ii) Perez would collect rents belonging to Avila and deposit those rents in Avila's bank account less her 10% fee; (iii) Perez failed to turnover rents belonging to Avila after November 2007, failed to make the repairs for which she had requested and received funds, and failed to purchase a lot, build a house on the lot and/or install the bathtub or roofing materials in that house; and (iv) Perez never made any sort of record or accounting of the funds that Avila had sent her or that she had collected on his behalf. As will be discussed in more detail below, Avila also established that Perez had a fraudulent intent when she committed each of the acts that would constitute embezzlement. *See infra* at pp. 31–43.

---

[91] As discussed in more detail below, the evidence was likely not objected to because any evidence related to embezzlement was also evidence that could have been used to prove up either or both of section 523(a)(2)(A) or (a)(4) claims. *See infra* at pp. 23–25.

**b. Did the Parties Recognize That the Issue of Embezzlement Was Being Tried?**

Based on the record before the Court, the Court concludes that Perez did not recognize that the issue of embezzlement was being tried. To be frank, the Court did not recognize that the issue of embezzlement was being tried. While the Court acknowledges that "as a general rule a party impliedly consents by failing to object to evidence supporting issues that go beyond the pleadings," *Haught v. Maceluch*, 68 F.2d 291, 305 (5th Cir. 1982), "recognition of whether an unpleaded issue has entered the case at trial 'depends on whether the evidence supporting the issue is also relevant to another issue in the case.' If the evidence overlaps in this fashion, it does not equate to implied consent 'absent a clear indication that the party who introduced the evidence was attempting to raise a new issue.'" *Portis v. First National Bank of New Albany*, 34 F.3d 325, 332 (5th Cir. 1994).

In order to determine whether the evidence submitted at trial overlaps with the pled claims, the Court must first consider the elements of the pled and unpled claims. As noted above, embezzlement under section 523(a)(4) is governed by federal law and is defined as the "'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) (citing *Greyhound Lines, Inc v. Thurston (In re Thurston)*, 18 B.R. 545, 550 (Bankr. M.D. Ga. 1982)). "To meet the definition of embezzlement, there must be proof of the debtor's fraudulent intent in taking the property." *Id.*

In turn, the defalcation exception to discharge covers "debts incurred through abuses of fiduciary positions . . . and involving debts arising from the debtor's acquisition or use of property that is not the debtor's." *FNFS, Ltd v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011). Defalcation is "a willful neglect of duty, even if not accompanied by fraud or

embezzlement. . . . Willful neglect 'does not require actual intent, as does fraud' . . ." *Id.* (citations omitted).

Finally, in *In re Acosta*, 406 F.3d 367 (5th Cir. 2005), the Fifth Circuit set forth a five-part test for determining nondischargeability for debts incurred by false pretenses, fraudulent representation or actual fraud under section 523(a)(2)(A). In order for a debt to be nondischargeable under this section, Avila must show that: (i) Perez made a representation; (ii) Perez knew the representation was false; (iii) Perez made the representation with the intention to deceive Avila; (iv) Avila actually and justifiably relied on the representation; and (v) Avila sustained losses as a proximate result of his reliance. *Id.* at 372. *See also*, *RecoverEdge, L.P. v Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

The Court concludes that the evidence supporting fraud or defalcation in a fiduciary capacity under section 523(a)(4) and false pretenses, a false representation or actual fraud under section 523(a)(2)(A) overlap with the evidence that would support an embezzlement claim to such an extent that it was not clear that the embezzlement claim was entering the record. Any evidence of fraudulent intent, which evidence would be required for an embezzlement claim, could be attributed to the section 523(a)(2)(A) claim, because false pretenses, fraudulent representation, and actual fraud are the grounds for nondischargeability under that section. Any evidence of the misappropriation of property, which would be required for embezzlement, could also have been evidence related to "debts arising from the debtor's acquisition or use of property that is not the debtor's" as is required for a fraud or defalcation in a fiduciary capacity claim.

Finally, until counsel for Avila raised embezzlement in her closing argument, there was no clear indication that Avila was attempting to raise an embezzlement claim. Indeed, counsel for Avila never mentioned the word "embezzlement" until her closing argument.

Given these circumstances, the Court must conclude that Perez did not recognize that the embezzlement claim was entering the evidence.

### c. Will Perez Be Prejudiced By a Finding That the Embezzlement Claim Was Tried by Consent?

The final requirement for implied consent is that a trial by consent will not prejudice the opposing party. Prejudice for the purposes of implied consent is defined as "whether the complaining party had a fair opportunity to litigate the issue at trial, and whether that party could offer additional probative evidence on that issue if the case were re-tried." *Silver v. Nelson*, 610 F. Supp. 505, 520 (E.D. La. 1985) (citing *International Harvester Credit Corp. v. East Coast Truck & R.V. Sales, Inc.*, 547 F.2d 888, 890 (5th Cir. 1977)); *see also*, *Brown Shoe Co., Inc. v. Commercial Credit Counseling Servs., Inc.*, 2008 WL 2148749 at *6 (S.D. Tex. 2008) ("The Fifth Circuit has indicated that a party opposed to amendment is prejudiced 'if an added claim would require it to reopen discovery and prepare a defense for a claim different from the one . . . that was before the court.' Put another way, a court must ask whether the proposed amendment would unfairly prejudice the opposing party by denying it notice of the nature of the added claims against it." (internal citations omitted)).

Perez did not argue against a finding of embezzlement in her pretrial briefing and did not offer any evidence to counter a potential embezzlement claim at trial, likely because she was operating under the reasonable understanding that Avila had dropped his embezzlement claim after having omitted it from the Joint Pretrial Order. Because Perez was unaware that the embezzlement claim was still a "live" claim, it cannot be said that Perez had a fair opportunity to litigate the issue at trial. Accordingly, the Court concludes that Perez would be prejudiced by a finding that the embezzlement claim was tried by consent.

### 4.  Is Avila Entitled to Relief Under Rule 60(b)?

Concurrently with his post-trial brief, Avila filed a motion seeking relief under Rule 60(b).[92]  Rule 60 provides relief from a judgment or order.  Specifically, Avila sought relief under Rule 60(b)(1) for mistake, inadvertence, surprise, or excusable neglect and Rule 60(b)(5) "applying the judgment prospectively is no longer equitable."

### a.  Is Avila Entitled to Relief under Rule 60(b)(1)?

The Fifth Circuit has set forth a number of factors that should shape a court's consideration of a Rule 60(b) motion.  These factors include:

> (1) That final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to do substantial justice; (4) whether the motion was made within a reasonable time; (5) whether — if the judgment was a default or a dismissal in which there was no consideration of the merits — the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgment, and there is merit in the movant's claim or defense; (6) whether there are any intervening equities that would make it inequitable to grant relief; and (7) any other factors relevant to the justice of the judgment under attack.

*Edward H. Bohlin Co., Inc. v. The Banning Co., Inc.*, 6 F.3d 350, 353 (5th Cir. 1993).  The Fifth Circuit has also set forth standards for what constitutes mistake and excusable neglect within the context of Rule 60(b)(1).  The Fifth Circuit has held that "gross carelessness, ignorance of the rules, or ignorance of the law" are insufficient bases for Rule 60(b)(1) relief.  *Id.* at 357.  In addition, according to the Fifth Circuit, it would be an abuse of discretion for a court to grant relief on the sole basis of counsel's carelessness with the law.  "In fact, a court would abuse its discretion if it were to [grant the relief sought] under Rule 60(b)(1) when the reason asserted as

---

[92]  The Rule 60(b) motion is located at Docket #41.

justifying relief is one attributable solely to counsel's carelessness with or misapprehension of the law or the applicable rules of court." *Id.*[93]

Excusable neglect requires a finding (i) of neglect, and (ii) that the neglect was excusable. "Once it is established that a party's neglect 'was at least a partial cause of its failure . . .' the moving party then has the 'burden to convince the court that its neglect was excusable.'" *In re FEMA Trailer Formaldehyde Prods. Liability Litig.*, 2012 WL 777268 at *4 (E.D. La. Mar. 8, 2012) (citing *Rogers v. Hartford Life & Accident Ins. Co.*, 167 F.3d 993, 939 (5th Cir. 1999)). Whether there has been excusable neglect is ultimately an equitable determination. *Pioneer Investment Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 395 (1993). In *Pioneer Investment*, the Supreme Court noted relevant circumstances that courts should examine when considering whether to grant relief on the basis of excusable neglect. These include (i) the risk of prejudice to the non-movant; (ii) the length of delay; (iii) the reason for the delay, including whether it was within the reasonable control of the movant; and (iv) whether the movant acted in good faith. *Id.*

Avila argues that any omission of an embezzlement claim from the Joint Pretrial Order was either a mistake or else constitutes excusable neglect. Perez disagrees, as does this Court. Rather, this Court concludes that Avila is not entitled to relief under Rule 60(b)(1) on the grounds of mistake, because the omission of an embezzlement claim from the Joint Pretrial Order is entirely attributable to the carelessness of Avila's counsel. This Court's Local Rules require submission of a joint pretrial order which "shall contain . . . (1) a summary of the claims and defenses of each party; . . . and (4) a list of contested issues of law." Local Bankruptcy Rule

---

[93] In the *Bohlin* case, appellants were seeking relief under Rule 60(b)(1) based on what the Fifth Circuit deemed a "mistaken conclusion" that the district court was suspending local court rules governing the timing of responses to motions. The Fifth Circuit stated that "ignorance of local rules or misconstruction of their applicability does not merit relief." *Edward H. Bohlin Co., Inc.*, 6 F.3d at 357.

7016-1(a). Pursuant to this rule, counsel was instructed to include all claims and contested issues of law in the Joint Pretrial Order. Avila offered no evidence that the omission of an embezzlement claim from the Joint Pretrial Order was due to anything more than mere attorney carelessness. Therefore, the Court will not grant relief under Rule 60(b)(1) on the basis of an alleged "mistake."

While the Court does find that there was "neglect," in that counsel for Avila failed to review the Joint Pretrial Order carefully enough to ensure that the embezzlement claim was retained, the Court does not believe this neglect was excusable. In particular, this Court concludes that the risk of prejudice to Perez, the non-movant, is severe enough to outweigh any possible excuse or any concern about the equities.[94] While Avila argues that Perez would not be prejudiced because Perez was clearly aware an embezzlement claim was being pursued, the Court cannot agree. Again, while the Court acknowledges that an embezzlement claim was included in the first pretrial order, in addition to being contained in the complaint and addressed in Perez's answer, that order was drafted by Perez in November of 2011[95] before Avila's current counsel was retained. Avila's current counsel was substituted in February of 2012.[96] The Court does not find it unreasonable for Perez to have assumed that new counsel received the case file,

---

[94] At the hearing on the Rule 60(b) motion, counsel for Avila repeatedly urged the Court not to hold the mistakes of counsel against Avila. The Court sympathizes with Avila and finds it unfortunate that he may be barred from an additional recovery here based on the actions of his counsel. The law, however, is clear that particularly in civil litigation, "mistakes of counsel, who is the legal agent of the client, are chargeable to the client, no matter how 'unfair' this on occasion may seem." *Pryor v. U.S. Postal Serv.*, 769 F.2d 281, 288 (5th Cir. 1985). *See also*, *Pioneer Inv. Servs.*, 507 U.S. at 396–97 ("In other contexts, we have held that clients must be held accountable for the acts and omissions of their attorneys . . . In so concluding, we found no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client.") (internal citations omitted).

[95] Avila's original counsel failed to respond to Perez regarding the preparation of a pretrial order, so this order was prepared by Perez's counsel based on the allegations in the complaint, which included embezzlement.

[96] Order Granting Motion to Substitute Attorney (Docket #26), February 8, 2012.

reviewed what evidence was available and then decided to no longer pursue an embezzlement claim. Moreover, Avila offered no evidence that his counsel attempted to put specific embezzlement language in the Joint Pretrial Order and that it was inadvertently deleted as the order was finalized.[97] Finally, as noted previously, embezzlement was entirely omitted from Avila's pretrial brief, making it even less obvious that embezzlement was still a "live" claim.

Because the Court concludes that Perez was unaware an embezzlement claim was still being pursued on the basis of the Joint Pretrial Order and pretrial briefing, the Court concludes that Perez would be unduly prejudiced by affording Avila the relief sought under Rule 60(b)(1) — particularly now that the trial has concluded.

### b. Is Avila Entitled to Relief Under Rule 60(b)(5)?

Rule 60(b)(5) authorizes relief in situations where applying the judgment prospectively would no longer be equitable. By the very language of the Rule, relief should only be granted from a judgment that has prospective effect.[98] *In re Moody*, 849 F.2d 902, 906 (5th Cir. 1988). While citing the rule in its motion, counsel for Avila cites no legal authority applying Rule 60(b)(5) in a situation such as this. In fact, based upon its independent research, this Court concludes that Rule 60(b)(5) is simply inapplicable here. The Fifth Circuit in *Cook v. Birmingham News*, 618 F.2d 1149 (5th Cir. 1980) cited Justice Cardozo for the definition of prospective. "The distinction is between restraints that give protection to rights fully accrued

---

[97] Indeed, much of Avila's counsel's testimony at the hearing on the Rule 60(b) motion consisted of conclusory statements of law rather than facts on which the Court could rely. Avila submitted no evidence that embezzlement had been contained in previous drafts of the Joint Pretrial Order, or any evidence that embezzlement had ever been discussed by counsel in their negotiations regarding the language to be included in the Joint Pretrial Order. Absent such evidence, the Court cannot find that Perez should have known that an embezzlement claim was still being pursued.

[98] Avila focuses exclusively on the equity portion of Rule 60(b)(5). However, the Court need only consider equity if it determines that the Order in question grants prospective relief.

upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative." *Id.* at 1152 (citing *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932)). A Joint Pretrial Order does not require the supervision of changing conduct or changing conditions and thus under the standard set out by Justice Cardozo, is not a prospective order or judgment. Because the Court is satisfied that the Joint Pretrial Order is not prospective in nature, the Court need not determine whether enforcement of the Joint Pretrial Order would no longer be equitable under Rule 60(b)(5).

For all of these reasons, no relief is available to Avila based on an embezzlement claim.

### B. Is Avila Entitled to a Judgment for False Pretenses, a Fraudulent Representation or Actual Fraud?

In order to liquidate his fraud claim against Perez under state law, Avila must prove that: (1) a material representation was made; (2) it was false; (3) when Perez made it, she knew it to be false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) Perez made it with the intention that it should be acted upon Avila; (5) Avila acted in reliance upon it; and (6) Avila thereby suffered injury. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *Gray v. Waste Resources, Inc.*, 222 S.W.3d 522, 524 (Tex. App. — Houston [14th Dist.] 2007, no pet.). Then, once his fraud claim has been liquidated, Avila must prove that this debt is nondischargeable under section 523(a)(2)(A). To do so, Avila must prove that: (1) Perez made representations; (2) at the time the representations were made, Perez knew they were false; (3) Perez made the representations with the intention and purpose to deceive Avila; (4) Avila actually and justifiably relied on such representations; and (5) Avila sustained losses as a proximate result of the representations. *RecoverEdge, L.P. v.*

*Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995). Avila bears the burden of proving his section 523(a)(2)(A) claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005). Because the elements of a fraud claim under state law and the elements of a nondischargeable claim under section 523(a)(2)(A) of the Bankruptcy Code are so similar, they will be considered together below.

### 1. Perez Made Material Representations.

To be actionable, a representation must be a representation of a material fact. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). To be "material," the statement must have induced Avila to enter into a transaction or series of transactions that he would not have entered into absent the representations. *See, e.g.*, *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P.*, 335 S.W.3d 297, 305 (Tex. App. — Houston [14[th] Dist.] 2010); *Am. Med. Int'l v. Giurintano*, 821 S.W.2d 331, 338 (Tex. App. — Houston [14[th] Dist.] 1991).

Here, the alleged representations are that (i) Perez would collect rents on Avila's behalf and deposit his share into his bank account; (ii) Perez needed funds to repair Avila's properties and that Perez would use the funds Avila provided for that purpose; (iii) Perez would purchase a lot for $10,000 on Avila's behalf, build a house on that lot, and split the sales proceeds of the house and lot with Avila; (iv) Perez needed to purchase a bathtub and roofing materials for the house being built on the lot, that said materials cost $1,000, and that the materials would be used in that house;[99] (v) Acres was worth the $85,000 Avila paid for it;[100] (vi) Perez would repay the

---

[99] Although the trial record is less than perfectly clear, Avila testified that the bathtub and roofing materials were for the same property and the demand letter indicates that the bathtub and roofing materials were for the same property. In addition, a "cheat sheet" prepared by Avila's counsel also indicates that the roofing materials and the bathtub were both for the house to be built on the lot. While the "cheat sheet" was not admitted into evidence, counsel for Perez did not object to the court being given a copy for its reference during the trial.

$8,000 Avila loaned her to pay her taxes from her share of the proceeds of the sale of their jointly-owned properties; and (vii) Perez would repay the $5,000 Avila loaned her for her restaurant venture from her share of the proceeds of the sale of their jointly-owned properties. Each alleged representation will be separately addressed below.

Regarding the first alleged representation, Avila testified, with corroboration from Perez, that Perez repeatedly told him that she would collect the rents on his properties, deduct her 10% fee, and deposit the remaining funds in his bank account.[101]  Based on the credible evidence at trial, the Court finds that Perez did as she represented until November 2007.  In November 2007, Perez did not make her usual monthly deposit of rent payments.  When Avila asked her about this, Perez told him that she had not had a chance to collect the November rents because she had been in Chicago with her sick grandmother.  Perez assured Avila that she would collect the rents as soon as she returned to Texas and would deposit his share in his account immediately after the first of the year.[102]  When confronted in January 2008, Perez informed Avila that she was in Guadalajara.  When Avila again pressed Perez for the rents, Perez next stated that she had needed the rents for repairs on several of the properties.  According to the testimony, Perez never deposited rents after November 2007 despite repeated representations that she would do so.[103]

---

[100]  In his demand letter, Avila asserts that Perez promised to repay Avila's down payment on Acres from the proceeds Perez's mother obtained from the sale of Acres.  Plaintiff's Exhibit 68.  On the witness stand, the only grievance Avila raised with respect to Acres was that the property was not worth what he paid for it.  Perez was never questioned about whether or not she promised to repay the down payment and therefore the Court is unwilling to conclude that a representation was made based solely on the demand letter.

[101]  Trial Record: Testimony of Avila, May 10, 2012 at 9:39–41 a.m.

[102]  Id. at 10:30–31 a.m.

[103]  Id.  It is unclear from the record whether Perez collected the rents and simply failed to turnover the funds or whether Perez failed to even collect the rents.  Ultimately for the purposes of this analysis it is not material which of the two scenarios actually occurred.

Regarding the second alleged representation, the parties stipulated that Avila sent Perez a total of $14,840 to fund repairs on several of the properties he had purchased with Perez's assistance. Stipulation #2 (Docket #39). Avila sent the money because Perez told him that repairs were needed, how much those repairs would cost, and that she would make the repairs. Based on the credible evidence at trial, the Court finds that those repairs were never completed and, in some instances, were never begun. The Court also finds that Avila would not have sent this money to Perez had Perez not informed Avila that it was necessary for repairs and that she would make the repairs.

Regarding the third alleged representation, while Perez denies that any lot ever existed and insisted instead that the $10,000 Avila sent her for the lot was simply a personal gift, the Court, as noted above, finds Avila's testimony more credible. *See supra* at pp. 14–15. Avila testified that Perez approached him about another potential investment opportunity. Specifically, according to Avila, Perez asked him to send her $10,000 to help finance the purchase of a lot. Perez would then title the lot in both Perez's and Avila's names and would construct a house on the lot, at which point the house and the lot would be sold and the proceeds split 50/50.[104] Based on the credible evidence at trial, the Court finds that Avila would not have sent $10,000 to Perez marked "for purchase of a lot" unless he believed that Perez was purchasing a lot for his benefit.

Regarding the fourth alleged representation, Avila testified that Perez informed him that the bathtub and roofing materials were needed for the house being built on the lot. Avila sent Perez $1,000 as Perez requested and she then told him that she used those funds to purchase a

---

[104] *Id.* at 10:13–14 a.m.

bathtub and roofing materials.[105]  However, neither the bathtub nor the roofing materials were ever installed in this house (or any other house).  According to Perez, the bathtub was stolen from her backyard and she had to abandon the roofing materials when she moved.  However, on this record, it is not clear to the Court that the items were ever really purchased by Perez.  And, as with the other funds requested by Perez, the Court finds that Avila would not have sent these funds absent Perez's representations.

Regarding the fifth alleged representation, the Court is satisfied that Perez represented that Acres was worth $85,000 at the time of Avila's purchase of it.

Regarding the sixth alleged representation, Perez testified that the $8,000 she needed to pay her taxes was a gift from Avila and not a loan.  She was unable to credibly explain why Avila would have made such a gift.  In contrast, Avila testified that Perez asked him to loan her $8,000 so that she could pay her taxes.  Moreover, Avila testified that Perez represented that she would repay him from her share of the proceeds of their jointly-owned properties once they were sold.[106]  The Court can find no reason why Avila would have given Perez $8,000 to pay her personal taxes had he not been assured that she would repay him when there were sufficient sales proceeds from which to do so.

Regarding the seventh alleged representation, Avila testified that he loaned Perez $5,000 to use in her restaurant venture.[107]  Again, Perez characterizes the $5,000 as a gift, but was unable to credibly explain why Avila would make such a gift.  Based on the credible evidence at

---

[105]  *Id.* at 10:13–15 a.m.  As noted above, the testimony is unclear about for which specific property the bathtub and roofing materials were purchased.  In any case, it is clear from the testimony that the roofing materials and bathtub were never installed in any house on the lot or in any other property owned by Avila.

[106]  *Id.* at 10:41 a.m.

[107]  *Id.* at 10:41–42 a.m.

trial, the Court finds that absent a representation that he would be repaid from sales proceeds, Avila would not have loaned Perez these funds.

Based upon the above analysis, the first prong of the test has been satisfied as to all of the alleged representations.

### 2. Perez Knew Her Representations Were False When She Made Them.

As will be explained more fully below, with respect to four of the representations the Court finds that Perez made them with knowledge of their falsity. While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. *Chicago, T. & M.C. Ry. Co. v. Titterington*, 19 S.W. 472, 474 (Tex. 1892). Further, while a failure to perform is not evidence by itself of intent not to perform, failure to perform is a circumstance that can be considered with other facts to establish intent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 423, 435 (Tex. 1986).

Avila began requesting payment of rents the first time Perez failed to deposit them according to her usual practice. Perez informed Avila that she had not collected the rents because she had been in Chicago visiting her sick grandmother, but that she would collect and deposit the rents on January 1, 2008. Avila accepted Perez's explanation and did not press the issue for a period of time. When January 1st came and went without a deposit, Avila again attempted to contact Perez and learned that she was in Mexico. The next time Avila inquired about the rents, Perez informed him that she was going to use some of them for repairs to properties and would reimburse Avila. Despite repeated inquiries, and repeated representations from Perez that she would deposit the rents, Perez never made another deposit of rents. The

evidence demonstrates that Perez was having significant personal financial difficulties by early 2008. Perez needed to borrow $8,000 to pay her taxes and had partnered in a restaurant that was losing money hand-over-fist. Based upon the credible evidence, the Court concludes that Perez was in desperate need of money and did not particularly care what she had to tell Avila in order to get it. Perez knew she was not going to deposit Avila's share of the rents when she made the representations.

Throughout their business relationship, Perez requested funds from Avila in order to make repairs on his properties. Based upon the credible evidence, the Court finds that Perez knew she would not make these repairs when she requested the funds. This finding stems largely from the fact that Perez consistently failed to make repairs to the properties, as Avila learned when he inspected the properties in October or November 2008, as well as from letters received from various tenants. Plaintiff's Exhibits 33 and 63. Moreover, despite her previous failures to use Avila's funds to repair properties, Perez continued to request additional funds for new repairs that were never made.

Perez's misrepresentations were perhaps the most egregious concerning the lot. As far as the Court can tell, there never was a lot. Perez herself insists that there was no lot and that Avila simply gave her $10,000 as a gift. However, Avila obtained a cashier's check for $10,000 that contains the notation that it was for the purchase of a lot. Based on the credible evidence, the Court finds that "the lot" was another scheme concocted by Perez in order to extract money from Avila. Her representation that she would purchase a lot with his funds was false when she made it, as Perez well knew.

The Court also finds that Perez knew she was making a false representation with respect to the bathtub and roofing materials. While Perez testified that she purchased the materials, she

also testified that they were never installed because the bathtub was stolen from her backyard and she was forced to abandon the roofing materials when she moved residences. Perez was unable to produce receipts or any other evidence to prove that she actually purchased these items. Because the Court is already highly skeptical of much of Perez's testimony, the Court finds this story incredible. The Court believes the most likely scenario is that Perez requested the $1,000 from Avila, as she had in the past, and then never used the funds for their intended purpose. The Court finds that Perez made a knowing misrepresentation as to the bathtub and roofing materials.

Further evidence of Perez's bad faith and fraudulent intent with respect to these four representations is evident from the invoices she produced in response to Avila's demand letter. On cross-examination here, Perez admitted that she fabricated each of the documents she submitted to Avila as proof that she had spent his monies on his behalf and to bolster her contention that Avila still owed her monies related to various of the transactions. When asked why she fabricated this evidence, Perez testified that she acted on the advice of her pre-bankruptcy counsel. The Court hopes this is not true. However, regardless of whether Perez created these exculpatory documents on her own or on the incredibly bad advice of counsel, the Court is troubled by the fact that Perez decided it was appropriate to fabricate evidence to attempt to explain her conduct. Perez's willingness to lie and obfuscate as it relates to Avila's claims is further proof to the Court of Perez's knowing bad acts.

The remaining three representations by Perez — i.e., the value of Acres, and when the loans would be repaid — must be addressed. For the reasons explained below, the Court finds that Avila failed to prove that Perez knew her representations were false when she made them. Turning first to the representation that Acres was worth $85,000 when Avila bought it, Avila

testified that he was unaware that (i) Acres belonged to Perez's mother, and (ii) Acres was not worth the $85,000 he paid for it. However, Avila testified that he never obtained an appraisal for Acres, relying instead on Perez's statements as to the value of the house.[108] Avila's concern about the value of Acres seems to have arisen after he learned that (i) Perez's mother was the former owner, and (ii) DCAD valued Acres at $38,020.[109] According to Avila, his concern was heightened when Acres was sold at foreclosure for approximately $60,000.[110]

However, this evidence, standing alone, does not establish that Perez misrepresented the value of Acres at the time Avila purchased it. Foreclosure sale prices do not necessarily represent fair market values. Moreover, this foreclosure took place at least ten months after Avila's purchase of Acres,[111] during which time property values in Dallas declined. Finally, and most importantly, Avila financed his purchase of Acres with Bank of America, as established by the Settlement Statement. Plaintiff's Exhibit 72. Bank of America required that Acres be appraised, and the cost of that appraisal was borne by Avila. *Id*. at line 803. It is highly unlikely that Bank of America would have allowed its loan to Avila to close if the property had failed to appraise for the purchase price, given that Bank of America was financing 85% of that purchase price. While it is unfortunate that Avila lost his down payment when Acres was foreclosed, Avila has simply failed to prove that Acres was worth less than $85,000 when he bought it. On this record, the Court finds that Perez did not misrepresent Acres' value to Avila.

---

[108] *Id*. at 10:38–40 a.m. Of course, there was an appraisal of Acres at the time of Avila's purchase. *See infra* at p. 38.

[109] *Id*.

[110] *Id*. at 10:51–52 a.m.

[111] Avila did not specifically state, nor was he asked to specifically state when Acres was sold at foreclosure. However, the DCAD records indicate that they were obtained in March 2009 and list Avila as the property owner. Plaintiff's Exhibit 79. The logical conclusion is that the foreclosure sale occurred at some point after March 2009.

Regarding Avila's loans to Perez, the Court has found that Perez represented that she would repay the loans from her share of the sale proceeds from the jointly-owned properties. *See supra* at pp. 12–13. However, there is no evidence in the record from which the Court can conclude that any of the jointly-owned properties were ever sold. In the absence of such evidence, there is no basis upon which the Court can conclude that the representations about repayment were false or that Perez knew they were false when she made them. In other words, absent proof that there were sale proceeds from which Avila could have been repaid and that Perez did not repay Avila despite the availability of funds, there is insufficient evidence from which the Court can conclude that Perez's representations were false when they were made.

Accordingly, the Court finds that Perez knew that representations (i), (ii), (iii) and (iv) were false when she made them and thus, the second prong is satisfied as to them. These four false representations will be referred to hereinafter as the "Misrepresentations."

### 3. Perez Made the Misrepresentations With the Intent Avila Rely on Them.

With respect to each of the Misrepresentations, the Court finds that Perez made them with the intent that Avila rely upon them. On this record, there is no doubt that Perez intended that Avila rely upon the Misrepresentations.

### 4. Avila's Reliance on the Misrepresentations Was Only Partially Justified.

In order to recover for the Misrepresentations and have his damages declared nondischargeable, Avila will need to prove that he actually relied upon the Misrepresentations and that his reliance was justified. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). For Avila's reliance to be justified, he is not required to show that he acted reasonably in relying on the Misrepresentations. *Lewis v. Bank of Am. NA*, 343 F.3d

540, 546 (5th Cir. 2003). However, Avila cannot recover if he blindly relied on misrepresentations that would have been obviously false given a cursory investigation. *Id.* "[I]t is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Field v. Mans*, 516 U.S. 59, 71 (1995) (citation omitted).

Here, the Court finds that Avila was justified in relying on Perez's misrepresentation about the rents up to a point. Until November 2007, Perez had never failed to collect and deposit the rents on time. Avila had no reason to disbelieve Perez when she told him that she would collect the rents upon her return to Texas from caring for her sick grandmother. While Avila's on-going faith in Perez's misrepresentations about the rents and Avila's failure to come to Texas to investigate sooner may limit his recovery, it does not eliminate his ability to recover. In other words, at some point Avila's reliance on Perez was no longer justified with respect to the collection of rents as explained further below in connection with an analysis of Avila's damages. *See infra* at pp. 42–44. However, Avila's actual reliance was justified up to that point.

The Court further finds that Avila actually and justifiably relied upon Perez's representations that the sums she had requested for repairs were, in fact, being used for repairs and that the repairs were being completed in a timely fashion. At least until Avila visited Texas in the fall of 2008, he had no reason to believe that the repairs were not being completed as Perez had represented. No tenants ever contacted Avila to complain and Avila never received any other indication that his money was not being used as Perez had represented. With no red flags to indicate otherwise, the Court finds that Avila's actual reliance was justified.

The Court next finds that Avila actually and justifiably relied upon Perez's representations concerning the lot. The lot transaction took place in August 2007. At that point, Avila had entered into previous transactions with Perez and was being paid his share of the rents for those properties on a monthly basis. There was nothing that should have indicated that there was not a lot for him to purchase, or that Perez would not build a house on that lot and then split the proceeds of the sale of that house and lot with him.

Finally, the Court finds that Avila's reliance on Perez was justified with regard to the $1,000 for a bathtub and roofing materials. Perez requested the $1,000 in June 2008. As noted above, prior to the fall of 2008, there was no indication that Perez was not making repairs as she had promised. Additionally, Avila had no reason to believe that Perez was not in the process of constructing a house on the lot. The Court finds that Avila's actual reliance was justified.

### 5. The Misrepresentations Caused Injury.

The credible evidence at trial establishes that Avila was injured by the Misrepresentations. Avila seeks to recover the following damages:[112] (i) $9,650 in unpaid rents;[113] (ii) $14,840 for repairs that were not completed ($5,840 for repairs on Galemeadow, $6,500 for repairs on Ramsey, and $2,500 for repairs on Delta Court); (iii) $10,000 for the lot; (iv) $1,000 for the bathtub and roofing materials; (v) $14,964.02, which sum represents Avila's

---

[112] While Avila seeks additional sums in his demand letter, during closing argument Avila's counsel itemized the damages being sought for the Court and stated that only these damages were sought by Avila.

[113] It is unclear to the Court from the evidence at trial why Avila is only seeking rents through May 2008, but the demand letter sent by Avila and the other pleadings filed in the case only seek rents from November 2007 to May 2008. Plaintiff's Exhibit 68.

down payment on Acres; (vi) $8,000 to repay the loan Avila made to Perez for her taxes; and (vii) $5,000 to repay the loan Avila made to Perez for her restaurant venture.[114]

The goal of direct measures of damages is to make the plaintiff whole. *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 162 (Tex. 1992). In order to recover actual or compensatory damages, Avila must prove that he suffered an injury as a result of Perez's wrongful conduct. *R.G. McClung Cotton Co. v. Cotton Concentration Co.*, 479 S.W.2d 733, 737 (Tex. Civ. App. Dallas 1972). Further, Avila must prove the extent of any injury he sustained. *Eberley v. First Nat'l Bank of Stanton*, 272 S.W.2d 532, 538 (Tex. Civ. App. 1954). Or, as stated by the Texas Supreme Court in *Arthur Anderson & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 816 (Tex. 1997), "[d]irect damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act." When measuring direct or actual damages, the issue is not what Avila would have gained had Perez's representations been true, but what Avila lost by being deceived. *George v. Hesse*, 93 S.W. 107, 107–08 (Tex. 1906).

Keeping these legal principles in mind, the Court finds that Avila was damaged by Perez's conduct. However, not all of Avila's requested damages are recoverable as explained below.

Avila's direct damages will be limited to (i) $5,850 in unpaid rents, (ii) $14,840 for not-completed repairs, (iii) $10,000 for the lot, and (iv) $1,000 for the roofing materials and bathtub. These damages "flow naturally and necessarily from the wrong" in that Avila would not have

---

[114] It is unclear from the trial testimony the exact amount of the restaurant loan. However, the pleadings all seek a total of $13,000 for the tax loan and the restaurant loan combined. Because we have clear testimony that the tax loan totaled $8,000, the remaining sum must necessarily be for the restaurant. $13,000 - $8,000 = $5,000.

sent these sums to Perez absent her fraudulent conduct and the Misrepresentations. These are the amounts that Avila lost due to Perez's deception.

The Court has reduced the amount of Avila's requested damages for unpaid rents due to the timing of when Avila was on notice that Perez was a dishonest actor. The Court will not award Avila the April or May rents being sought, as Avila should have been aware after his March visit to Texas that Perez was lying to him. While the Court finds it credible that Avila could have believed Perez's numerous excuses and explanations for a few months, after his March visit, there should have been no doubt that Perez was a dishonest actor, particularly since Avila himself testified that he was concerned and that there were red flags at that point.[115] Moreover, by April, Perez had failed to pay Avila his share of the rents for 6 months. In short, by April Avila was no longer justified in relying on Perez's excuses.

Because the Court has already determined that Avila was unable to prove every element of his fraud claim with respect to Acres and the two loans, *see supra* at pp. 38–39, the $14,964.02 of damages sought for Acres and the $13,000 of damages arising from Perez's failure to repay the loans are not recoverable here.

For these reasons, Avila is entitled to a judgment against Perez in the amount of $31,690.00 (the "Judgment") and the Judgment is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

### C. Is the Judgment Nondischargeable under section 523(a)(4) — *i.e.*, is there a Debt for Fraud or Defalcation while Acting in a Fiduciary Capacity?

Having just concluded that Perez defrauded Avila, *see supra* p. ___, the Court will next determine if the fraud occurred while Perez was acting in a fiduciary capacity such that the

---

[115] While being cross-examined by counsel for Perez, Avila admitted that he was very concerned by January 2008 and that he believed something possibly untoward was going on. Avila was specifically asked if he recognized that there were "red flags" to alert him to the fact that Perez was a less than honest actor, to which he responded yes. Trial Record: Testimony of Avila, May 10, 2012 at 11:32–35.

Judgment is also excepted from Perez's discharge under section 523(a)(4) of the Bankruptcy Code. Finally, the Court will determine if the other alleged "bad acts" of Perez — *i.e.*, the failure to repay the loans and the representation about Acres' value — constitute "defalcations while acting in a fiduciary capacity" within the meaning of section 523(a)(4).

### 1. Was Perez Acting in a Fiduciary Capacity With Respect to Her Acts of Fraud?

The Judgment will not be excepted from Perez's discharge under section 523(a)(4) unless she was acting in a fiduciary capacity. The term fiduciary in the context of section 523(a)(4) is construed narrowly and is limited to "technical trusts" and to traditional fiduciary relationships involving "trust-type" obligations imposed by statute or common law. *In re Harwood*, 637 F.3d at 619.[116] However, there has been significant disagreement in reported decisions about what is meant by the requirement that there be a "technical trust." The Fifth Circuit has recognized that the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships where such obligations are imposed by statute or common law. *LSP Inv. P'Ship v. Bennett (In re Bennett)*, 989 F.2d 779, 784–85 (5th Cir. 1993). "The scope of the concept of fiduciary under section 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists." *In re Harwood*, 637 F.3d at 619.

---

[116] *See also*, *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998); *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1339 (5th Cir. 1980); *In re Jones*, 445 B.R. 677, 707 (Bankr. N.D. Tex. 2011) ("As used in Section 523(a)(4) of the Bankruptcy Code, 'fiduciary' is, indeed, 'limited to instances involving express or technical trusts.' In other words, a mere constructive or implied trust is not enough for purposes of Section 523(a)(4) of the Bankruptcy Code.").

Under Texas law, a fiduciary is "a person owing a duty of integrity and fidelity . . . applying to any person who occupies a position of peculiar confidence towards another." *In re Holdaway*, 388 B.R. 767, 776 (Bankr. S.D. Tex. 2008) (citing *Lee v. Hasson*, 2007 WL 236899 at *8 (Tex. App. — Houston [14th Dist.] 2007)). "An informal fiduciary duty may arise from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship . . . An informal fiduciary relationship exists where, because of family relationship or otherwise, one party is in fact accustomed to be guided by the judgment or the advice of the other." *Id.* (internal citations omitted). However, fiduciary relationships are not to be created lightly. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997).

Before analyzing whether Perez was acting a fiduciary capacity with regard to any of her fraudulent actions, the Court notes that Perez was acting in three separate roles in her dealings with Avila: (i) as a real estate agent, (ii) as a property manager, and (iii) as a borrower. With respect to the Misrepresentations (which gave rise to the Judgment), Perez was acting as a property manager (with respect to the rents, the repairs, and the bathtub and roofing materials) and a real estate agent (with respect to the lot).

Taking the lot first, Avila asks the Court to conclude that the realtor/client relationship was sufficient to create a fiduciary duty in Perez. *See generally*, Plaintiff's Post-Trial Brief (Docket #32). Avila analogizes to general principal/agent relationships and cites several Texas cases stating that the relationship between agent and principal is a fiduciary relationship. *SJW Property Commerce, Inc.*, 328 S.W.3d at 155; *Orozco v. Sander*, 824 S.W.2d 555 (Tex. 1992); *Ross v. Tex. One P'Ship*, 796 S.W.2d 206 (Tex. App. — Dallas 1990). In addition, Avila relies upon regulations of the Texas Real Estate Commission, including 22 Tex. Admin. Code § 531.1 (2012), which state that "[a] real estate broker or salesperson, while acting as an agent for

another, is a fiduciary. Special obligations are imposed when such fiduciary relationships are created."

At least some Texas courts have ascribed a fiduciary duty to real estate brokers or salespersons while engaged in transactions on behalf of their clients.[117] Additionally, at least some bankruptcy courts have recognized that a real estate broker who received funds from his or her client for a specific purpose acts as a fiduciary under section 523(a)(4). *See, e.g., In re Woosley*, 117 B.R. 524, 529 (9th Cir. BAP 1990); *Stevens v. Briles (In re Briles)*, 228 B.R. 462, 466 (Bankr. S.D. Cal. 1998).

The Court concludes that Perez had a fiduciary duty to Avila with regard to the lot. Accordingly, Avila's $10,000 of damages for the lot are also nondischargeable under section 523(a)(4) of the Bankruptcy Code.

In contrast, Perez was acting as a property manager when she (i) collected rents on Avila's behalf and undertook to deposit his share of those rents in his bank account, (ii) requested and received monies from Avila for repairs to his properties, and (iii) requested and received monies to buy a bathtub and roofing materials. Avila failed to cite the Court to anything suggesting that a property manager is a fiduciary to a property owner under Texas law. The Court was unable to find such authority either. In fact, based on accepted definitions of "fiduciary" under Texas law, this Court concludes that Perez did not owe Avila a fiduciary duty while acting as his property manager. "One is acting in a 'fiduciary capacity' when 'the business which he transacts, or the money or property which he handles, is not his own or for his benefit, but for the benefit of another person, as to whom he stands in a relationship implying or

---

[117] *Si Kyu Kim v. Harstan, Ltd.*, 286 S.W.3d 629, 643 (Tex. App. — El Paso, 2009) ("Real estate brokers are fiduciaries and are required to exercise fidelity and good faith towards their principal."); *NRC, Inc. v. Huddleston*, 886 S.W.2d 526, 530 (Tex. App. — Austin 1994) (jury instructions informed the jury that real estate agencies are fiduciaries toward sellers of real estate).

necessitating *great* confidence and trust on the one part and a *high degree* of good faith on the other part." *In re Jones*, 445 B.R. at 706 (emphasis added). *See also*, *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1992) (stating that the term fiduciary refers to a person owing a duty of integrity and fidelity and it applies "to any person who occupies a position of peculiar confidence towards another."); *In re Estate of Kuykendall*, 206 S.W.3d 766, 771 (Tex. App. — Texarkana 2006, no pet.) (concluding that a fiduciary relationship is an extraordinary one and will not be created lightly); *In re Estate of Abernathy*, 2012 WL 1943760 at *4 (Tex. App. — El Paso May 30, 2012) ("The mere fact that one party subjectively trusts another party does not alone indicate that confidence is placed in another in the sense demanded by fiduciary relationships because something apart from the transaction between the parties is required.").

From this Court's perspective, the informal relationship between Avila and Perez with respect to her management of his properties is legally insufficient to constitute a fiduciary relationship for purposes of section 523(a)(4). There is no evidence in the trial record suggesting that Perez occupied a position of "peculiar confidence" with regard to Avila. Avila certainly trusted Perez, but mere trust is legally insufficient.[118]

For these reasons, Avila's damages with respect to the lot — *i.e.*, the $10,000 he gave to Perez to purchase the lot — is excepted from her discharge in accordance with section 523(a)(4), but his damages with respect to rents, repairs, and the bathtub and roofing materials are not excepted from her discharge in accordance with section 523(a)(4).

---

[118] *In re Estate of Abernathy*, 2012 WL 1943760 at *4 (Tex. App. — El Paso May 30, 2012) ("The mere fact that one party subjectively trusts another party does not alone indicate that confidence is placed in another in the sense demanded by fiduciary relationships because something apart from the transaction between the parties is required."). Because Avila will be able to have his debts for the rents, repairs and bathtub/roofing materials excepted from Perez's discharge under section 523(a)(2)(A), this finding is ultimately of little real consequence.

Finally, the only way Avila's alleged damages from (i) the purchase of Acres, and (ii) Perez's failure to repay the loans Avila made to her can be excepted from Perez's discharge is if those acts constitute defalcations while in a fiduciary capacity within the meaning of section 523(a)(4), to which we now turn.

### 2. Was There a Defalcation in a Fiduciary Capacity?

Defalcation, for purposes of section 523(a)(4), "is a willful neglect of duty, even if not accompanied by fraud or embezzlement." *In re Harwood*, 637 F.3d at 624 (citing *Moreno v. Ashworth*, 892 F.2d 417 (5th Cir. 1990)). Willful neglect does not require actual intent and is "measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known." *Id.* (citing *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220 (5th Cir. 2001)).

Based upon the evidence adduced at trial, the Court finds that Perez's actions with respect to Acres and the loans did not constitute a willful neglect of duty. Perez represented that Acres was worth $85,000. Avila failed to prove that this was not the value of Acres at the time of his purchase. With respect to the loans, there is no evidence suggesting that Avila's funds were used for any purpose other than that for which they were requested — *i.e.*, Perez used the monies to pay her personal taxes and for her restaurant venture. Accordingly, Perez's actions did not constitute a willful neglect of a duty owed to Avila.

Finally, with respect to the two loans, the relationship between Avila and Perez was that of lender/borrower. There is no fiduciary relationship between lenders and borrowers under Texas law. *In re Hicks*, 384 B.R. 443, 454 (Bankr. N.D. Tex. 2008). Therefore, the Court concludes that Perez was not acting as a fiduciary when she borrowed money from Avila. For

this additional reason, Avila will be unable to have any such debt deemed non-dischargeable under section 523(a)(4).

## III.    CONCLUSION

Avila is entitled to the entry of the Judgment for Perez's fraud.  Moreover, Avila has proven that the Judgment is excepted from Perez's discharge under section 523(a)(2)(A) of the Bankruptcy Code.

Additionally, Avila has proven that $10,000 of the Judgment (damages with respect to the lot) is also excepted from Perez's discharge under section 523(a)(4) of the Bankruptcy Code as a debt incurred by fraud while acting in a fiduciary capacity.

However, Avila failed to prove that he is entitled to assert an embezzlement claim or that he is entitled to except the remainder of the Judgment from Perez's discharge under section 523(a)(4) of the Bankruptcy Code.

A judgment consistent with this Memorandum Opinion will be entered separately.

### ### End of Memorandum Opinion ###